# AFFIDAVIT OF WILLIAM R. McDERMOTT

I, Special Agent William R. McDermott, depose and state as follows:

## INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been since 2003. For much of that time, I have been engaged in gang and drug investigations. I am currently assigned to the FBI, Boston Office. In this role I work with numerous agents and law enforcement officers in investigating drug distribution and trafficking throughout the United States. In the course of participating in investigations of drug trafficking, I have conducted or participated in surveillance; the purchase of illegal drugs; the execution of search warrants; debriefings of subjects, witnesses, and informants; wiretaps; and reviews of consensually recorded conversations and meetings. Through my training, education, and experience, I have become familiar with the manner in which drug traffickers conduct their illegal drug trafficking activity, which includes the use of cellular telephones to communicate with customers, associates and sources of drug supply.

2. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(857) 492-7878** (the "Target Telephone Number"), with listed subscriber Trevel BREWSTER, and believed to be used by Trevel BREWSTER, (the "Target Telephone"). The service provider for the Target Telephone is Sprint, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, KS 66251. The Target Telephone is further described in Attachment A, and the location information to be seized is further described in Attachment B.

3. Based on the facts set forth in this affidavit, there is probable cause to believe that Trevel T. BREWSTER, date of birth XX/XX/1994, and others have violated 21 U.S.C. §§ 841(a)(1) and 846 by knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance, specifically crack cocaine, and by conspiring to do the same. There is probable cause to believe that the location information described in Attachment B will constitute evidence of these crimes and will lead to the identification and location of those who committed them. The location information described in Attachment B will also assist law enforcement in arresting BREWSTER, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4), at the appropriate time.

4. The information contained in this affidavit is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, information from confidential informants/cooperating witnesses, controlled buys of controlled substances, public records, database checks, and other investigations. Any dates and times in this affidavit are approximate. This affidavit is intended only to demonstrate that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

5. The United States, including the Federal Bureau of Investigation, is conducting a criminal investigation of Trevel T. BREWSTER, date of birth: XX/XX/1994, regarding possible violations of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846.

6. Since February 2020, members of the FBI and the Boston Police Department ("BPD") have been investigating drug trafficking by BREWSTER in the Boston area of

Massachusetts. BREWSTER has been identified by BPD as a member of the Franklin Hill Street Gang.

7. According to the BPD, the Franklin Hill Street Gang is a Boston neighborhood-based street gang with nearly 20 individuals believed to be actively associated with it. For many years, the Franklin Hill Street Gang has been involved in an ongoing dispute with a group from the area of Magnolia Street/Intervale Street in Boston (as well as several other more sporadic disputes with other area groups).

### INFORMATION FROM CONFIDENTIAL SOURCES

8. Over the course of the investigation, Special Agents of the FBI and Detectives of the BPD have received information from a Cooperating Witness ("CW-1") concerning the illegal drug trafficking of BREWSTER.

9. CW-1 has provided information about BREWSTER to include his methods of distribution, telephone numbers used to facilitate distribution, and locations used to facilitate drug trafficking activity. CW-1 continues to provide information about BREWSTER, his co-conspirators, and his drug trafficking activities.

10. CW-1 began cooperating with law enforcement in January 2018. CW-1 has positively identified numerous individuals involved in drug trafficking, illegal firearm possession, and gang activity. CW-1 has conducted numerous consensually recorded conversations in person and over the telephone. CW-1 has made numerous drug purchases from and recordings from target subjects in other investigations, in addition to the ones from BREWSTER described below. CW-1 has a lengthy criminal history including arrests for larceny-type offenses, drug distribution, and violent offenses. The information that CW-1 provided has been corroborated by the video of the

controlled drug purchases, the recovery of the controlled substances, and by the investigation generally. I consider the information provided by CW-1 to be reliable. CW-1 has received consideration in the form of the deferred prosecution of a potential drug offense and financial assistance in connection with his/her cooperation.

### Identification of the Target

11.     Trevel T. BREWSTER, also known as ("a/k/a") "Tru," date of birth XX/XX/1994, is a twenty-five year-old male.  BREWSTER lists a mailing address with the Massachusetts ("MA") Registry of Motor Vehicles of 113 Regent Street, Apartment 1, Boston, MA and an address with the MA Board of Probation of 42 Idaho Street, Mattapan, MA.

12.     A check of the MA Board of Probation and Interstate Identification Index indicates BREWSTER has state convictions for unarmed burglary (2019), possession to distribute a class B controlled substance (2019), possession of a class C controlled substance (2019), carrying a dangerous weapon (2019), witness intimidation (2015, 2016), breaking and entering in the nighttime (2016), larceny from a person (2016), assault (2016), assault and battery with a dangerous weapon (2016), resisting arrest (2015), and open cases for possession of a large capacity loaded firearm, possession to distribute a class B controlled substance, and assault and battery. According to the BPD, BREWSTER is a member of the Franklin Hill Street Gang.

### The Target Telephone

13.     The Target Telephone, assigned telephone number (857) 492-7878 (the "Target Telephone Number"), is a telephone serviced by Sprint, subscribed to by Trevel BREWSTER. The Target Telephone became active on August 13, 2019 and remains active.  I believe, based on my training and experience, an analysis of the telephone data for the Target Telephone, and my

involvement in this investigation, that BREWSTER uses the Target Telephone for drug-related conversations. I believe that BREWSTER is likely to maintain the Target Telephone and will likely possess the Target Telephone on or near his person throughout the day. The location of the Target Telephone will aid investigators in identifying BREWSTER's co-conspirators, stash houses, drug suppliers, and money laundering activity.

### Controlled Purchases Involving the Target Telephone

14. In February and March 2020, CW-1 conducted controlled purchases of narcotics from BREWSTER. At the direction of investigators, though outside the presence of the investigative team, CW-1 contacted BREWSTER, in the day or days prior to the controlled purchases to ask BREWSTER to purchase a specific amount of crack cocaine. SA Kenny confirmed CW-1's contact with the Target Telephone, by reviewing the call history and text logs of CW-1's Phone.

**Controlled Purchase #1:**

15. On a predetermined date in February 2020[1], CW-1 met with SA Kenny, Task Force Officer ("TFO") Timothy Stanton, and me at a prearranged meeting place. I searched CW-1 and found him/her to be free of contraband. CW-1 was provided audio/video recording devices, including a device that would transmit to SA Kenny for CW-1's safety. CW-1 was provided with $800 in Official Agency Funds ("OAF"). CW-1 previously arranged with BREWSTER to meet him in the afternoon to purchase 14 grams of crack cocaine for $800. SA Kenny photographed the text exchange and call history between CW-1 and BREWSTER.

16. CW-1 traveled to the meeting location in Boston provided by BREWSTER under

---

[1] Exact dates and locations of meetings between CW-1 and BREWSTER are withheld to protect CW-1's anonymity.

the observation of the surveillance team. Upon arrival, SA Kenny overheard, via the transmitter, CW-1 on the phone speaking with BREWSTER. Thereafter, SA Kenny and TFO Stanton observed BREWSTER enter CW-1's vehicle and heard CW-1 meeting with BREWSTER. SA Kenny overheard, via the transmitter, BREWSTER directing CW-1 to travel to another location. The surveillance team maintained surveillance as CW-1 drove BREWSTER to another location in Boston.

17. Once at that location, CW-1 parked, and CW-1 and BREWSTER waited in CW-1's vehicle. SA Kenny overheard, via the transmitter, BREWSTER on the phone. Based upon the portion of the conversation that he could hear, SA Kenny believed that BREWSTER was speaking to a co-conspirator who would be delivering the drugs to BREWSTER.

18. After some time, the surveillance team observed BREWSTER exit CW-1's vehicle and walk into a crowded parking lot, where the surveillance team temporarily lost sight of BREWSTER. Several minutes later, BREWSTER returned to CW-1's vehicle. SA Kenny was able to observe BREWSTER provide suspected crack cocaine to CW-1. The surveillance team maintained surveillance as CW-1 drove BREWSTER back to the original location. BREWSTER then exited CW-1's vehicle.

19. SA Kenny and TFO Stanton followed CW-1 back to a predetermined location. CW-1 produced a plastic bag containing suspected narcotics, consistent in appearance with crack cocaine. After agents retrieved the suspected crack cocaine from CW-1, CW-1 was searched by TFO Patrick O'Brien and was found to be free of contraband.

20. CW-1 said that he/she arrived at the agreed upon location and called BREWSTER. Minutes later, BREWSTER entered CW-1's vehicle. BREWSTER directed CW-1 to drive to a

second location. Once at the second location, BREWSTER asked CW-1 for the money. CW-1 handed BREWSTER the $800 in OAF. BREWSTER exited CW-1's vehicle with the $800 in OAF. CW-1 observed BREWSTER meet with an individual in a white sedan in the parking lot. BREWSTER then returned to CW-1's vehicle and handed CW-1 the plastic bag containing the suspected crack cocaine. BREWSTER then directed CW-1 to drop him off at the original agreed-upon location.

21. A field test of the suspected crack cocaine was presumptively positive for the presence of cocaine base. Investigators weighed the crack cocaine and the weight was approximately 15.4 grams with packaging. Additional testing will be conducted on the crack cocaine at the Drug Enforcement Administration, North East Laboratory.

22. I have reviewed the audio/video recording from Controlled Purchase #1. Below are two still photographs taken from that recording.



BREWSTER in CW-1's car, receiving the OAF.



BREWSTER with plastic bag containing crack cocaine.

**Controlled Purchase #2:**

23.     On a predetermined date in March 2020[2], CW-1 met with SA Kenny, TFO Richard Fucci, TFO Timothy Stanton, TFO Patrick O'Brien, SA Mercedes Casella, and me at a prearranged meeting place. CW-1 previously arranged with BREWSTER to meet him in the afternoon to purchase 28 grams of crack cocaine for $1500. In the presence of SA Kenny, CW-1 made a recorded call to BREWSTER at the Target Telephone number to confirm the purchase. BREWSTER directed CW-1 to go to the location in Boston where CW-1 and BREWSTER had met for Controlled Purchase #1.

24.     CW-1 was searched by TFO Fucci and TFO O'Brien and was found to be free of contraband. CW-1 was provided audio/video recording devices, including a device that would transmit to SA Kenny for CW-1's safety. CW-1 was provided with $1600 in OAF[3]. SA Kenny photographed the text exchange and call history between CW-1 and BREWSTER.

---

[2] Exact dates and locations of meetings between CW-1 and BREWSTER are withheld to protect CW-1's anonymity.
[3] Investigators provided CW-1 with an extra $100 OAF as investigators are aware that drug prices often fluctuate resulting in an increase of the agreed-upon price.

25. CW-1 traveled to the meeting location in Boston provided by BREWSTER under the observation of the surveillance team. Upon arrival, SA Kenny overheard, via the transmitter, CW-1 on the phone. Thereafter, TFO O'Brien observed an individual enter CW-1's vehicle. SA Kenny and I observed BREWSTER in the front passenger seat of CW-1's vehicle and heard CW-1 meeting with BREWSTER. Based on the conversation between CW-1 and BREWSTER, investigators believed that BREWSTER was waiting for a co-conspirator to arrive with the crack cocaine.

26. Approximately five minutes later, the surveillance team observed a white Chevrolet Malibu with an out-of-state license plate arrive in the area.[4] The surveillance team then observed BREWSTER exit CW-1's vehicle and enter the Chevrolet Malibu.

27. The surveillance team observed the Chevrolet Malibu drive around the neighborhood block and return to the area where CW-1 was waiting in CW-1's vehicle. The surveillance team observed BREWSTER exit the Chevrolet Malibu and enter CW-1's vehicle. SA Kenny and I were able to observe BREWSTER provide suspected crack cocaine to CW-1. Moments later, the surveillance team observed BREWSTER exit CW-1's vehicle.

28. SA Kenny and I followed CW-1 back to a predetermined location. CW-1 produced a plastic bag containing suspected narcotics, consistent in appearance with crack cocaine. After agents retrieved the suspected crack cocaine from CW-1, I searched CW-1 and he/she was found to be free of contraband. CW-1 provided SA Kenny with the $100 in excess OAF.

29. CW-1 said that he/she was met by BREWSTER at the agreed upon location. BREWSTER explained to CW-1 that he was waiting for "his man" to bring the crack cocaine.

---

[4] This license plate is known to investigators but withheld as this investigation is ongoing.

CW-1 observed a white Chevrolet sedan arrive. CW-1 recognized the white Chevrolet sedan from Controlled Purchase #1. BREWSTER asked CW-1 for the money. CW-1 handed BREWSTER the $1500 in OAF. BREWSTER exited CW-1's vehicle and entered the white Chevrolet sedan. The white Chevrolet sedan drove out of the area. Minutes later, the white Chevrolet sedan drove down a nearby street and let BREWSTER out. BREWSTER returned to CW-1's vehicle and handed CW-1 the plastic bag containing the suspected crack cocaine. BREWSTER then exited CW-1's vehicle.

30. A field test of the suspected crack cocaine was presumptively positive for the presence of cocaine base. Investigators weighed the crack cocaine and the weight was approximately 29.7 grams with packaging. Additional testing will be conducted on the crack cocaine at the Drug Enforcement Administration, North East Laboratory.

31. I have reviewed the audio/video recording from Controlled Purchase #2. Below are two still photographs taken from that recording.



BREWSTER in CW-1's car receiving OAF.



BREWSTER with plastic bag containing crack cocaine.

**Identification of BREWSTER by CW-1**

32.     On March 11, 2020, SA Jonathan James, who has no knowledge of BREWSTER and is not assigned to this investigation, administered a "blind" photo array to CW-1. CW-1 identified BREWSTER as the individual CW-1 had met who sold CW-1 crack cocaine.

**Conclusion**

33.     Based on the above, I believe that BREWSTER has used and will continue to use the Target Telephone to communicate with co-conspirators in furtherance of the Target Offenses. I believe that the precise location information requested by the proposed warrant will enable investigating agents to determine where BREWSTER conducts his drug distribution business, with whom he meets, where he meets, and/or where he stores additional quantities of controlled substance and/or drug proceeds, and may assist in determining the identity of additional co-conspirators. Specifically, the precise location information will enable investigators to determine the approximate locations that BREWSTER frequents so that law enforcement agents can conduct physical surveillance of him meeting with unidentified associates engaging in criminal activity such as the distribution of controlled substances. Therefore, the location of the Target Telephone

is likely to yield evidence and information related to BREWSTER's illegal drug distribution activities.

34.     One purpose of applying for the warrant is to determine with precision the Target Telephone's location. However, there is reason to believe the Target Telephone is currently located somewhere within this district because its owner BREWSTER's last known address is in this District; BREWSTER is known to spend most of his time in this district; the area code of the Target Telephone Number corresponds to this district; and physical surveillance has observed BREWSTER in this district on multiple occasions within the past thirty days. Pursuant to Rule 41(b)(2), law enforcement may locate the Target Telephone outside the district provided the Target Telephone is within the district when the warrant is issued.

### The Relevant Technology

35.     I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not

<30-mj-01030-DLC   Document 1-1   Filed 03/25/20   Page 13 of 15

necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

**Authorization Request**

36. I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.[5]

37. I also request that the Court direct Sprint ("the Service Provider") to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Telephone on the Service Provider's network, and at such intervals and times as directed by the government. The government will compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

38. I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order the Service Provider not to notify any person (including the subscribers or customers to whom the materials relate) of the existence of this application, the warrant, or the execution of the warrant, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b), the Service Provider may disclose this Order to an attorney for the Service Provider for the purpose of receiving legal advice. Non-disclosure is appropriate in this case because the Court's Order relates

---

[5] 18 U.S.C. § 2703(c) authorizes a "court of competent jurisdiction" to issue a search warrant for the kinds of records that this application seeks. A "court of competent jurisdiction" includes a district court ("including a magistrate judge") that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation. There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by: giving targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual. See 18 U.S.C. § 2705(b).

39. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay any required notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

40. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Telephone outside of daytime hours.

41. I further request that the Court order that all papers in support of this application,

including the affidavit and search warrants, be sealed until further order of the Court, except that the government may produce them in criminal discovery and provide the search warrant to the Service Provider. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

*Agent McDermitt attested to the veracity of the affidavit by phone before the undersigned*

William R. McDermott
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on March 25, 2020.

_____
HONORABLE DONALD L. CABELL
U.S. MAGISTRATE JUDGE

15